# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-14-00388-CR

Matthew Alan Baxter, Appellant

v.

The State of Texas, Appellee

## FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
## NO. 70,722, HONORABLE JOHN GAUNTT, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Matthew Alan Baxter of aggravated sexual assault. *See* Tex. Penal Code § 22.021. The trial court assessed punishment at thirty years' imprisonment. *See id*. §§ 12.32, 22.021(f). On appeal, appellant raises three issues challenging the trial court's admission of evidence showing that the victim had a sexually transmitted disease and a fourth issue challenging the trial court's admission of a written statement appellant provided to police during the underlying investigation in this case. We will affirm the trial court's judgment of conviction.

## BACKGROUND

The record shows that appellant was living with his girlfriend and his girlfriend's four-year-old daughter, E.T.M., in October 2012. A school counselor at E.T.M.'s preschool testified that E.T.M. was referred to her on October 16, 2012, by the school nurse because the nurse was concerned about bruises on E.T.M.'s face. After speaking with E.T.M., the counselor called a

detective to the school. Both the school counselor and the detective testified that E.T.M. discussed how she got the bruises and that they stopped the interview and called Child Protective Services ("CPS") when E.T.M. made a punching motion toward her vagina with her fist to demonstrate how she had been hit.

The evidence further shows that E.T.M. was taken to a hospital for an examination, where a sexual assault nurse examiner interviewed E.T.M. and observed injuries in and around her vagina and bruises to her body. The nurse also collected a urine sample from E.T.M. to be used to determine whether E.T.M. had any sexually transmitted diseases. A doctor testified that E.T.M. tested positive for chlamydia based on the urine sample, and E.T.M.'s mother testified that she also tested positive for chlamydia after she learned of the result of E.T.M.'s test.

A detective who interviewed appellant after he was arrested testified that appellant made a written statement during the interview, asserting that a bruise on E.T.M.'s head and a bite mark on her buttocks were caused by him when he was playing with E.T.M. The detective testified that appellant continued talking to him after writing the statement and that appellant then wrote an additional statement in which he made an admission regarding his penis making contact with E.T.M.'s mouth.

The jury convicted appellant of aggravated sexual assault, and the trial court assessed punishment at thirty years' imprisonment. This appeal followed.

**DISCUSSION**

*Admission of Evidence of Sexually Transmitted Disease*

In his first three issues, appellant challenges the trial court's admission of evidence showing that E.T.M. tested positive for chlamydia. Specifically, appellant argues that the trial court erred in (1) denying his motion in limine, in which he objected to the admission of any evidence regarding E.T.M. having chlamydia based on the alleged unreliability of the scientific testing procedure used; (2) admitting evidence regarding the scientific procedure used to determine whether E.T.M. had chlamydia because the trial court used the wrong burden of proof in making its determination; and (3) admitting evidence showing that E.T.M. had chlamydia because the relevance of the evidence was outweighed by the risk of unfair prejudice in admitting the evidence.

We review the trial court's admission of evidence for an abuse of discretion, and we do not reverse the trial court's ruling unless the ruling falls outside the zone of reasonable disagreement. *See Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015); *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010). An expert witness may testify as to her opinion based on scientific knowledge if it will help the trier of fact understand the evidence or determine a fact in issue. Tex. R. Evid 702. A party proffering expert testimony must show that the scientific evidence is reliable through clear and convincing evidence showing that: (1) the underlying scientific theory is valid, (2) the technique applying the theory is valid, and (3) the technique was properly applied on the occasion in question. *Sexton v. State*, 93 S.W.3d 96, 100 (Tex. Crim. App. 2002). Upon the request of the defendant in a criminal case, the trial court must conduct a "gatekeeping" hearing outside the presence of the jury "to determine whether scientific evidence is

3

sufficiently reliable and relevant to help the jury in reaching an accurate result." *Coble*, 330 S.W.3d at 273; *see* Tex. R. Evid. 705(b) ("Before an expert states an opinion or discloses the underlying facts or data, an adverse party in a . . . criminal case must . . . be permitted to examine the expert about the underlying facts or data. This examination must take place outside the jury's hearing.").

Here, appellant objected to the admission of evidence of E.T.M.'s positive chlamydia test prior to trial and requested a hearing about the reliability of the scientific testing procedure used to obtain the diagnosis. The trial court conducted the hearing in a pre-trial proceeding and then overruled appellant's objection. At trial, the State called a medical expert who explained the scientific procedure used in determining the diagnosis and testified that E.T.M. tested positive for chlamydia. The trial court also admitted medical records showing E.T.M's positive result.

Even assuming, without deciding, that the trial court erred in admitting evidence that E.T.M. tested positive for chlamydia, we conclude that the error would be harmless. The erroneous admission of evidence is non-constitutional error. *See Coble*, 330 S.W.3d at 280; *Bagheri v. State*, 119 S.W.3d 755, 763 (Tex. Crim. App. 2003); *Jessop v. State*, 368 S.W.3d 653, 678 (Tex. App.—Austin 2012, no pet.). Accordingly, any error must be disregarded unless it affected appellant's substantial rights. *See* Tex. R. App. P. 44.2(b); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *Coble*, 330 S.W.3d at 280. If the improperly admitted evidence did not influence the jury or had but a slight effect on its deliberations, the error is harmless. *Id.*; *Bagheri*, 119 S.W.3d at 763.

In conducting a harm analysis, we examine the entire trial record and calculate, to the extent possible, the probable impact of the error on the rest of the evidence. *Coble*, 330 S.W.3d at 280. Important factors in considering non-constitutional error are the nature of the evidence supporting the verdict, the character of the alleged error, and how the alleged error might be considered in connection with other evidence in the case. *Bagheri*, 119 S.W.3d at 763. In analyzing the erroneous admission of expert testimony, we may consider, among other things: (1) the strength of the evidence of the defendant's guilt; (2) whether the jury heard the same or substantially similar admissible evidence through another source; (3) the strength or weakness of an expert's conclusions, including whether the expert's opinion was effectively refuted; and (4) whether the State directed the jury's attention to the expert's testimony during arguments. *See Coble*, 330 S.W.3d at 286–87.

In this case, the evidence of appellant's guilt was extensive. The sexual assault nurse examiner who examined E.T.M. on the same day as E.T.M. first reported sexual abuse testified that she observed injuries to E.T.M.'s genital area, including three bruises, two lacerations, and petechia in and around her vagina. The nurse examiner testified that "petechia" was "the little red pinpoint, looks almost like if you really rub skin really hard you get that kind of marking if it's been rubbed." She testified that she also observed and took photos of other bruises on E.T.M.'s body, including bruises on her face and buttocks. The photos were admitted into evidence. The nurse examiner's forensic report was also admitted into evidence and included her diagrams of injuries to E.T.M.'s body. The diagrams showed several bruises on E.T.M.'s legs, buttocks, back, and face. Further diagrams of a boy and a girl in the nurse examiner's report indicate that E.T.M. used the term "tooshee" for both a vagina and a penis.

The nurse examiner's testimony, as well as her report, also described the nurse examiner's interview of E.T.M. before the exam.  Some of the relevant excerpts from the interview include the following:

Nurse:     Did somebody touch you that made you uncomfortable; in a way that you did not like?

E.T.M.:     Yes, [appellant] did.

Nurse:     Who is [appellant]?

E.T.M.:     My daddy.

Nurse:     What happened?

E.T.M.:     [Appellant] hit me, in my back and my tooshee [points to her Female Sexual Organ].  It hurts.  He hit me in the face.
                . . . .

Nurse:     Did anyone else touch you that you did not like?

E.T.M.:     My mommy, she spanked me . . . well, [appellant] did this . . . [Takes her own fist and demonstrates a punch to her own Female Sexual Organ.]
                . . . .

E.T.M.:     [Patient starts to play with toys in room; looks up and then states:] He put his tooshee in my mouth. [points to Male Sexual Organ on body diagram].  He spit in my mouth with his mouth; now it is in my tummy.

Nurse:     Who is he?

E.T.M.:     [Appellant].

In addition to the nurse examiner's testimony, a forensic interviewer from the local children's advocacy center testified about her interview of E.T.M., which occurred the day after

E.T.M. first reported abuse. The forensic interviewer testified that she asked E.T.M. if she was scared of anyone, and E.T.M. told her she was scared of appellant. When she asked E.T.M. why she was scared of appellant, E.T.M. told her that it was because appellant "punches her in her tooshee." The interviewer testified that E.T.M. used the term "tooshee" to describe both a vagina and a penis. She further testified that E.T.M. told her that appellant "put his tooshee in her mouth" and that he "chokes her in her mouth with his tooshee." When asked whether anything came out of appellant's "tooshee," E.T.M. stated that "pee" came out and described it as "sticky" and "white." The interviewer testified that she asked E.T.M. if appellant's "tooshee" touched anywhere else on E.T.M.'s body, and E.T.M. stated that it also touched her "butt" and that it hurt. The interviewer also testified that she asked E.T.M. about a bite mark on her buttocks that had been discovered in the exam the day before, and E.T.M. stated that she got it from appellant.

The school counselor who first spoke with E.T.M. at her school after the initial discovery of bruises on E.T.M.'s face testified that E.T.M. showed her "that she had been hit this way with a fist toward her groin area." The detective who had been called to the school by the counselor stated that E.T.M. "was asked a question about one of her injuries, and she had balled up her fist and made a punching motion to her vaginal area." The detective further testified that he took photographs of E.T.M. that day, and the trial court admitted the photographs into evidence. The photographs show several bruises on E.T.M.'s face and bruising on her leg and back.

By the time of trial, E.T.M. was six years old and was reluctant to answer several questions, including questions in which the State asked her to identify the male sexual organ on a diagram. In response to questions by the State regarding whether a part of her body touched

appellant's "tooshee," she stated that she was "scared to remember." Ultimately, she testified that

her mouth touched appellant's "tooshee," that it felt "gross," and that his "tooshee" was hard, not

soft. She also testified that appellant caused bruises on her face, hurt her arm, dropped her on the

floor, made her legs hurt, and "did bad things to [her]."

Appellant also made a statement to a detective after he was arrested and put his

statement into writing. The statement was admitted into evidence at trial.[1] In the initial statement,

appellant wrote the following, in relevant part:

> The bruise on [E.T.M.'s] head came from me and [E.T.M.] playing a head butting
> game. Stopped playing once the bruise appeared. The bite mark on [E.T.M.'s] butt
> came from when me and her were wrestling around. I bite and we continued
> to wrestle.

In the additional statement, appellant wrote, in relevant part:

> I would also like to add on Monday the 15th 2012 after bedtime and everyone else
> had fallen asleep, I got [E.T.M.] up to go to the bathroom. After [E.T.M.] had gone
> potty, she went back to bed and I followed her to tuck her in. When she sat on her
> bed she pointed at my dick and asked what it was. I was wearing my green robe and
> that was all I had on. I showed her and let her touch it when she asked. I told her to
> open her mouth, and she grab[bed] my dick and stuck it in her mouth. I felt that what
> was happening was wrong and put her back to bed and went to bed myself.

E.T.M.'s mother testified that she and E.T.M. lived with appellant in a one-bedroom

apartment at the time of the reported abuse. She testified that she and appellant slept in the bedroom,

---

[1] In his final issue, appellant challenges the trial court's admission of the additional statement. In our analysis of the issue below, we conclude that the trial court did not err in admitting the statement.

and E.T.M. slept on a chair in the living room.  She further testified that appellant sometimes put E.T.M. to bed and that he also woke E.T.M. during the night to take her to the bathroom because she had a bed-wetting problem.  She testified that she never woke up at night.  She also testified that she did not work at the time, but she left E.T.M. alone with appellant at times when she went to the grocery store and convenience store.

In addition to the extensive evidence of appellant's guilt, the record also shows that the State made a point to explain during closing arguments the way in which the challenged evidence could properly be considered by the jury.  The State explained that the jury could consider the evidence of appellant's extraneous offenses, including the evidence that E.T.M. had chlamydia, only if the jury believed beyond a reasonable doubt that the other offenses occurred and only for the purpose of considering appellant's state of mind and the relationship he had with E.T.M.  The State also emphasized that the only issue for the jury to decide was whether the State proved the elements of the charged offense, which was that appellant caused E.T.M.'s mouth to contact his sexual organ.  Specifically, the prosecutor stated:

> Paragraph seven [of the jury charge] tells you that there is testimony before you in the case regarding the defendant's having committed offenses other than the offense alleged in the indictment, okay?  Keep in mind that [the] offense alleged in the indictment is that on October 15th, 2012, that the defendant caused [E.T.M.'s] mouth to contact his sexual organ in Killeen, Bell County, Texas.  Those are the elements of the offense . . . We heard—you know, we heard from [the nurse examiner] about the injuries to [E.T.M.].  We heard all the things that [E.T.M.]—when she was safe and had somebody she could talk to, and [the forensic interviewer], all the things that [E.T.M.] disclosed to her.  And we heard what [the medical expert] said about those kinds of injuries.  And we heard about the sexually transmitted disease that [E.T.M.] had.  That's what this is talking about.  That's what this paragraph is talking about, that you can consider those things if you believe them beyond a reasonable doubt.  And I don't think there is a doubt in anybody's mind that [that] four-year-old girl at

9

that time had a sexually transmitted disease and she had injuries to her genitals. You take that into consideration as to the relationship between [E.T.M.] and [appellant]. What was going on? What was going on? And then you can use that information to say things like: You know, he may have said that [E.T.M.] was the aggressor here, that she's the one that grabbed his sexual organ and put it in her mouth. Not when you have all this other stuff, folks. He knew what he was doing.

. . . .

Then you have the right to consider all the facts that are shown by the evidence and to draw natural and reasonable inferences from such facts. That's common sense. Just like what we talked about, you can use those extraneous offenses that we call them—the injuries to her, the chlamydia, that kind of thing—you can use that with your common sense to help you understand what occurred, what occurred at that house in Killeen, Bell County, Texas.

We get to about the middle of the page [of the jury charge]. We must prove each and every element. Just those seven things, just the elements of the offense. You may have some questions about everything that was going on . . . You know, how could some of this stuff happen? Those are not elements of the offense. They are things that will bother you, but it really comes down to did he cause [E.T.M.'s] mouth to contact his sexual organ?

. . . .

And [the evidence], folks, along with common sense is probably the most important part of this Charge and that is to focus on what the evidence showed you in this case as to those seven elements that he's charged with.

Although the State briefly reminded the jury in the second portion of closing arguments that the evidence showed that E.T.M. and E.T.M.'s mother both tested positive for chlamydia, the bulk of the State's references to E.T.M.'s positive chlamydia test were as set forth above and properly instructed the jury as to the way in which the evidence could be considered.[2]

---

[2] We further note that there was no direct evidence presented at trial showing that appellant had chlamydia.

As referenced by the State in closing arguments, the jury charge also included an instruction as to the proper way for the jury to evaluate and consider evidence of appellant's extraneous offenses. Specifically, the charge stated:

> You are instructed that if there is any testimony before you in this case regarding the [appellant's] having committed offenses other than the offense alleged against him in the indictment in this case, you cannot consider said testimony for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same for the purpose of determining the state of mind of [appellant] and the child or the previous and subsequent relationship between [appellant] and the child, if any.

Considering the extensive evidence of appellant's guilt, both direct and circumstantial—including E.T.M.'s testimony that her mouth touched appellant's sexual organ, the statements she made to the nurse examiner and forensic interviewer that appellant put his sexual organ in her mouth, and appellant's admission that his sexual organ made contact with E.T.M.'s mouth—and considering that the jury received proper instructions in the jury charge and closing arguments about how to evaluate and consider the challenged evidence, we conclude that the admission of the evidence that E.T.M. had chlamydia, if error, did not have a substantial and injurious effect or influence in determining the jury's verdict and was therefore harmless. *See* Tex. R. App. P. 44.2(b); *Coble*, 330 S.W.3d at 280, 286–87; *Bagheri*, 119 S.W.3d at 763.

Our conclusion that the admission of the challenged evidence was harmless disposes of all of appellant's first three issues because all of the issues—the trial court's denial of appellant's objection in his motion in limine, the trial court's alleged application of an incorrect burden of proof, and the trial court's admission of the evidence over an objection that the relevance of the evidence

11

was outweighed by the risk of unfair prejudice in admitting the evidence—resulted in the admission of the same evidence.  Accordingly, we overrule appellant's first three issues.

### *Admission of Appellant's Additional Written Statement*

In his fourth issue, appellant contends that the trial court erred in admitting the additional statement he provided to police because the statement was not made voluntarily. Specifically, he argues that the statement did not contain the warnings required by article 38.22 of the Texas Code of Criminal Procedure and that the detective who interrogated him lied to him about having incriminating DNA evidence and told him several times that he did not believe he was telling the truth.  Article 38.22 of the Texas Code of Criminal Procedure provides that:

> No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
>
> (a) the accused, prior to making the statement, . . . received from the person to whom the statement is made a warning that:
>
> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>
> (2) any statement he makes may be used as evidence against him in court;
>
> (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
>
> (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
>
> (5) he has the right to terminate the interview at any time; and

(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

*See* Tex. Code Crim. Proc. art. 38.22, § 2.

When considering whether a statement was voluntarily made, we look to the totality of the circumstances surrounding its acquisition. *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007). At a hearing on the voluntariness of a written statement, "[t]he trial court is the sole judge of the weight and credibility of the evidence, and the trial court's finding may not be disturbed on appeal absent a clear abuse of discretion." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995), *overruled on other grounds by Warner v. State*, 245 S.W.3d 458, 463 (Tex. Crim. App. 2008). In this case, the trial court held a hearing outside the presence of the jury, and the detective who interrogated appellant testified about his interactions with appellant. He testified that appellant agreed to speak with him, that he read appellant his *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436 (1966), that he had appellant read the warnings himself, that he asked appellant if he understood each of the warnings, and that appellant answered affirmatively and wrote his initials next to each warning. State's Exhibit 16, the initial written statement, shows appellant's initials next to each warning and his signature at the bottom of the page. The detective testified that appellant talked to him and then put his statement into writing and signed it. He further testified that after appellant finished writing the statement, he and appellant continued talking, and he told appellant that he did not believe appellant was telling the truth. Appellant gave him further information, and he asked appellant to put the new information into writing. The detective testified that appellant

13

wrote an additional statement, which became State's Exhibit 17 at trial, and that the detective treated it as a continuation of the first statement.

The detective testified that the entire interview, including the conversation between him and appellant and the creation of both written statements, lasted about three-and-a-half hours. The beginning and ending times notated on State's Exhibit 16 and 17 are consistent with the detective's testimony about the time frame. State's Exhibit 17, the additional written statement, shows that the warnings were crossed out and had "N/A" written over them and that appellant began his statement with the words, "I would like to add . . ."

During cross-examination, when defense counsel asked the detective how many times he told appellant that he believed he was lying, the detective answered, "Probably a few times." In response to a question about whether he told appellant that appellant's DNA had been found in E.T.M.'s sexual organ, the detective testified, "I may have said something along that line, yes, sir" and that he did not in fact have any information about DNA evidence in the case. After considering the evidence, the trial court ruled that State's Exhibit 17, the additional statement, was a continuation of State's Exhibit 16, the initial statement, and that the statement in State's Exhibit 17 was voluntarily made.[3]

We agree with the trial court's determinations. The two cases discussed by appellant with respect to this issue in his brief, *Franks v. State*, 712 S.W.2d 858 (Tex. App.—Houston [1st

---

[3] We abated this case and remanded it to the trial court to enter findings of fact and conclusions of law in accordance with section 6 of article 38.22 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. art. 38.22, § 6. The trial court subsequently entered findings of fact and conclusions of law and ordered a supplementary record prepared and filed with this Court. Accordingly, we reinstated the appeal.

Dist.] 1986, pet. ref'd) and *Murphy v. State*, 100 S.W.3d 317 (Tex. App.—San Antonio 2002, pet. ref'd), help illustrate why we reach this conclusion. In *Franks*, police provided *Miranda* warnings to the defendant before interrogating him for approximately thirty minutes and then took a break to interview other witnesses. 712 S.W.2d at 860–61. Approximately three and a half hours later, the police resumed their questioning of the defendant without reiterating the warnings. *Id.* at 860. The court held that "the second phase of the interrogation was merely a continuation of the interrogation process, and that under the circumstances presented, there was not such a 'break' in the interrogation proceeding as to require the giving of new warnings." *Id.* at 861. Appellant argues that this case is distinguishable from *Franks* because in *Franks*, the police officer asked, "And you remember earlier that I have advised you of your Constitutional Rights?" before renewing questioning. However, in this case, the evidence shows that there was no break in questioning. Rather, the evidence shows that appellant received his warnings, wrote his initial statement, continued talking with the detective, and then wrote an additional statement, all within a single three-and-a-half-hour-long interview. Thus, a case like *Franks*, where new warnings were not required even after a break in questioning, supports a conclusion that new warnings would not be required before appellant added more written information to a statement he made within a single interview. We also note that several other cases are consistent with our holding in this case and the holding in *Franks*. *See, e.g.*, *Bible v. State*, 162 S.W.3d 234, 241–42 (Tex. Crim. App. 2005); *Newson v. State*, No. 05-14-01455-CR, 2015 WL 7302525, at *4–5 (Tex. App.—Dallas Nov. 19, 2015, no pet.) (mem. op., not designated for publication); *Cotten v. State*, No. 08-13-00051-CR, 2013 WL 6405511, at *4–5 (Tex. App.—El

15

Paso Dec. 4, 2013, pet. ref'd) (not designated for publication); *Burruss v. State*, 20 S.W.3d 179, 183–84 (Tex. App.—Texarkana 2000, pet. ref'd).

The other case cited by appellant, *Murphy,* also supports our determination in this case. In *Murphy*, the defendant provided a written statement to the police. 100 S.W.3d at 321 n.7. At that point, the police officer asked the defendant whether he would like to add anything to the statement, and the defendant answered affirmatively and provided a handwritten addendum to the first written statement. *Id.* The defendant argued on appeal that the trial court erred in admitting the addendum because it did not contain a statement showing that he "knowingly, intelligently, and voluntarily waived his rights." *Id.* After concluding that the defendant's argument lacked merit, the court stated that "because the addendum was not a separate statement by [the defendant], but rather, a continuation of the statement he had just signed for authorities, there was no need for the addendum to also include a waiver statement." *Id.* Appellant asserts that this case is distinguishable from *Murphy* because the defendant in *Murphy* simply offered additional information in response to a question about whether he had anything to add, while in this case, appellant "was accused of lying and [the detective] misrepresented there was DNA evidence connecting appellant to the offense . . . caus[ing] appellant to recant his denial and admit to oral sex with [E.T.M.]." However, there is no indication in the record of when during the interrogation the detective made the misrepresentation about DNA evidence. Further, misrepresentations made by the police to a suspect during an interrogation are relevant factors in assessing whether the suspect's confession was voluntary, but they are insufficient to render an otherwise voluntary confession inadmissible. *Green v. State*, 934 S.W.2d 92, 99 (Tex. Crim. App. 1996). The misrepresentations must be viewed in the context

16

of the totality of the circumstances, as some types of police deception during custodial interrogation are permissible. *Id.* "The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined." *Id*. at 99–100. Of the potential types of police deception, a misrepresentation relating to an accused's connection to the crime is the least likely to render a confession involuntary. *Id.* at 100.

Here, the record shows that the only misrepresentation made by the detective was that the police discovered appellant's DNA in E.T.M.'s sexual organ, which related to appellant's connection to the crime. Thus, the misrepresentation falls within the realm of those that are not likely to render a statement involuntary. *See id.* at 99–100 (detective's statement during interrogation that there was eyewitness to murder did not render defendant's statement involuntary); *Weaver v. State*, 265 S.W.3d 523, 535 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd) (officers' misrepresentations that witnesses, fingerprints, and video linked defendant to crime were not type of deception that likely caused involuntary confession). With respect to appellant's argument that his statement was rendered involuntary by the detective's assertions that he believed appellant was lying, we note that appellant has not cited to any authority in support of his argument. On the contrary, the Texas Court of Criminal Appeals has held that assertions like those made by the detective in this case do not render a defendant's statement involuntary. *See Estrada v. State*, 313 S.W.3d 274, 297 (Tex. Crim. App. 2010) (statement voluntary despite interrogation techniques that included accusations of criminal conduct and assertions that defendant was lying).

We further note that the trial court properly instructed the jury regarding the jury's consideration of the voluntariness of appellant's statement. *See* Tex. Code Crim. Proc. art. 38.22,

17

§ 6; *Oursbourn v. State*, 259 S.W.3d 159, 165 (Tex. Crim. App. 2008). Specifically, the jury charge included a paragraph stating:

> You are instructed that our law provides that you should not consider as evidence any statement made by a defendant, or any evidence obtained as a result of such statement, unless the evidence convinces you beyond a reasonable doubt that the statement was made voluntarily by the defendant. Therefore, unless you find from the evidence beyond a reasonable doubt that the alleged statement of the defendant was made voluntarily, or if you entertain a reasonable doubt as to whether it was made voluntarily, you shall not consider such statement for any purpose whatsoever nor shall you consider any evidence obtained from such statement.

Given the evidence in the record showing that appellant properly received the *Miranda* warnings, that he continued talking to the detective after writing his first statement without a break in the interview, and that the detective's assertions that he thought appellant was lying and that he had DNA evidence when he did not are not the type of assertions that render a defendant's statement involuntary, we conclude that the trial court did not err in admitting the additional written statement provided to police by appellant. Accordingly, we overrule appellant's fourth issue.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment of conviction.

_____
                                     Cindy Olson Bourland, Justice

Before Justices Puryear, Pemberton, and Bourland

Affirmed

Filed:   June 2, 2016

Do Not Publish