**Affirmed as Modified and Opinion filed June 27, 2024.**



In The

# Fourteenth Court of Appeals

### NO. 14-23-00057-CR

**RACHEL ANN CHILDS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 300th District Court**
**Brazoria County, Texas**
**Trial Court Cause No. 93257-CR**

## OPINION

A jury convicted appellant Rachel Ann Childs of three counts of trafficking of persons. *See* Tex. Penal Code Ann. § 20A.02(a)(1), (3)(A), (4). Raising five issues on appeal, appellant argues that: (1) her conviction on all three offenses violated the Double Jeopardy Clause of the Fifth Amendment (issues one and two), (2) the trial court erred by excluding two of her witnesses (issue three), (3) the judgment should be reformed to reflect that the fines run concurrently (issue four), and (4) the reimbursement fee should be stricken from the judgment

because there is no evidence to support it. We overrule issues one, two, three, and five; but we sustain issue four. Accordingly, we modify the judgment to reflect that the fines run concurrently and affirm, as modified, the remainder of the judgment as challenged on appeal.

## I. BACKGROUND

It is undisputed that appellant is an only child but pretended to be "Kat," her older sister with autism, after she hired Rachel Callahan to serve the fabricated needs of Kat, including diapering, wiping, bathing, and feeding. It is also undisputed that appellant is neither autistic nor incapable of taking care of herself.

Callahan, the complainant, is a board-certified behavior analyst. She testified that she has worked with both children and adults with autism. In May 2018, she began providing respite care for adults with disabilities; she advertised her services through Care.com.[1]

In early December 2018, Callahan received an inquiry through Care.com from Kat, who was looking for a respite caregiver for her 29-year-old adult twin sister. Appellant later texted Callahan that her sister had filled in the blanks on Care.com incorrectly and that it was actually appellant who was seeking care for Kat. Callahan agreed to care for Kat on a Friday/Saturday in December 2018. Appellant gave Callahan specific instructions on how to care for Kat, including eating and bedtime routines. Appellant also explained that Kat would be alone when Callahan arrived because appellant was busy with law school and she didn't want to interrupt Kat's transition to a new caregiver.

When Callahan arrived at appellant's home, she found Kat watching television and coloring with crayons. Callahan proceeded to care for Kat,

---

[1] Care.com is an internet portal where people looking for care and those offering care can seek to connect.

including feeding her, changing her diaper, bathing her, and putting her to bed. Appellant had given Callahan instructions to lay down with Kat at bedtime, but Callahan refused to do so. Callahan recounted:

> So, I put her in bed and I gave her the pacifier and the blanket and I— she started to kind of fuss as if she was scared. And so, I—I sat down on the bed with her. And [appellant] had told me, like, rubbing her back would help. So, I kind of lightly rubbed her upper back outside of her clothing for a few minutes; and she—she turned around and kind of—she was facing the wall and I was seated kind of behind her on the other side of the bed rubbing her back like this and she—she turned around, like her torso around like that, and she grazed my breast with her hand kind of like this and then moved it to my bicep really quickly. And then at some point also during that interaction she put her face on my chest and nuzzled in between my breasts, and I kind of moved back like this.

Callahan testified that she found this "violating and odd." She also recounted two of the times that she changed Kat's diaper that she found unusual:

> On two occasions when I was wiping her and changing her, she reached down with her hand and touched her vulva and clitoris area.
>
> . . .
>
> I've toilet trained many adults. I've helped with a lot of toileting issues with adults. Typically if someone reaches down during that time it's, like, to scratch an itch, you know, or to address something. They're uncomfortable. This was not that. This is kind of putting her—you know, the pads of her fingers on her upper area and making massage circles as if to masturbate. So, the way the behavior looked was odd.

Callahan left the home the next afternoon; she later confronted appellant about her suspicion that appellant was pretending to be Kat.

The jury found appellant guilty on all three counts and assessed punishment at imprisonment for 2, 4, and 10 years, respectively, in addition to $5,000, $10,000, and $10,000 in fines, respectively. Appellant filed a timely notice of

3

appeal.

## II.    DOUBLE JEOPARDY

In her first issue, appellant argues that her conviction on all three offenses violated the Double Jeopardy Clause of the Fifth Amendment. Specifically, appellant does not contest the sufficiency of the evidence; rather, she argues that instead of committing three separate offenses of trafficking of persons, she only committed a single offense. Accordingly, she requests that we vacate the separate convictions below and reform the judgment to reflect a single conviction, keeping only the most severe punishment—$10,000 in fines and 10 years.

### A.    Standard of review and applicable law

The Double Jeopardy Clause provides three types of protection: 1) protection against a second prosecution for the same offense following an acquittal; 2) protection against a second prosecution for the same offense following a conviction, and 3) protection against multiple punishments for the same offense. *Kuykendall v. State*, 611 S.W.3d 625, 627 (Tex. Crim. App. 2020). This case involves the third of these protections.

What constitutes the "same offense" for double-jeopardy purposes in the multiple-punishments context is strictly a matter of legislative intent; stated differently, "how many different offenses did the Legislature contemplate an accused should be susceptible to being punished for?" *Speights v. State*, 464 S.W.3d 719, 722 (Tex. Crim. App. 2015). "There are two ways in which legislative intent can be ascertained: by analyzing the elements of the offenses in question, or by identifying the appropriate 'unit of prosecution' for the offenses." *Garfias v. State*, 424 S.W.3d 54, 58 (Tex. Crim. App. 2014). When, as here, the offenses are all defined within the same statute, we use the unit-of-prosecution analysis. *See*

4

*Speights*, 464 S.W.3d at 722.

> A "units" analysis consists of two parts: (1) what the allowable unit of prosecution is, and (2) how many units have been shown. The first part of the analysis is purely a question of statutory construction and generally requires ascertaining the focus or gravamen of the offense. The second part requires an examination of the trial record, which can include the evidence presented at trial.

*Ex parte Benson*, 459 S.W.3d 67, 73–74 (Tex. Crim. App. 2015) (footnotes & citations omitted). In determining the allowable unit of prosecution, we must identify the gravamen of the offense and then classify the offense as "a result-of-, nature-of-, or circumstances-surrounding-conduct offense."[2] *Ortiz v. State*, 623 S.W.3d 804, 806 (Tex. Crim. App. 2021). In a result-of-conduct offense, different types of results are considered to be separate offenses, while different types of conduct used to obtain the result are not. *See Huffman v. State*, 267 S.W.3d 902, 907 (Tex. Crim. App. 2008) (superseded by statute on other grounds).

## B.     Analysis

The allowable unit of prosecution for the offense of trafficking of persons has not yet been pronounced by the Court of Criminal Appeals, but two courts of appeals have concluded that trafficking of persons is a result-of-conduct offense. *See Castoreno v. State*, No. 04-18-00409-CR, 2019 WL 938276, at *5 (Tex. App.—San Antonio Feb. 27, 2019, no pet.); *Ramos v. State*, No. 13-06-00646-CR, 2009 WL 3210924, at *9 (Tex. App.—Corpus Christi–Edinburg Oct. 8, 2009, no pet.). Appellant likewise argues that trafficking of persons should be categorized as a result-of-conduct offense, and the State agrees. However, the parties disagree on the gravamen of the offense.

---

[2] "The gravamen of the offense is . . . '[t]he substantial point or essence of a claim, grievance, or complaint[.]'" *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015).

According to appellant, her three charges do not constitute three separate offenses but rather a single offense because the result in all three-charged offenses is the same: a single person was trafficked on a single occasion. However, the State asserts that the three-charged offenses represent three different, statutorily-defined results of appellant's conduct, and thus are separate offenses. We agree with the State that the three-charged offenses are separate results—and thus separate offenses—for double-jeopardy purposes.

In support of her argument, appellant compares the offense of trafficking of persons to the offense of injury to a child. *See* Tex. Pen. Code Ann. § 22.04 We find this comparison unpersuasive. Section 22.04 states:

> (a) A person commits an offense if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes to a child, elderly individual, or disabled individual:
>> (1) serious bodily injury;
>> (2) serious mental deficiency, impairment, or injury; or
>> (3) bodily injury

*Id.* Appellant relies on *Villanueva v. State*, in which the court concluded the offense of injury to a child, by act or omission, constitutes the same offense for jeopardy purposes. 227 S.W.3d 744, 748 (Tex. Crim. App. 2007) (citing *Jefferson v. State*, 189 S.W.3d 305, 312 (Tex. Crim. App. 2006)). The court noted that both action and omission are contained within the same subsection—22.04(a)—and were listed in the alternative. *See Villanueva*, 227 S.W.3d at 748. And ultimately, both omission and action criminalize the same result: injury to a child. *Id.*

In contrast, the three offenses of which appellant was convicted are found in different subsections: Texas Penal Code Sections 20A.02(a)(1) (count one), 20A.02(a)(3)(A) (count two), and 20A.02(a)(4) (count three). And, as we discuss

6

in more detail below, these three subsections criminalize three distinct results in this case: (1) appellant trafficking Callahan with the intent that she engage in forced labor/services in the form of respite care (count one); (2) appellant causing Callahan to agree to give appellant sexual contact in exchange for a fee (count two); and (3) receiving a benefit of sexual arousal and gratification from participating in a venture that involved Callahan agreeing to receive a fee to engage in sexual contact (count 3).

### 1. Count one – labor trafficking

In count one, the State alleged that appellant "did knowingly traffic [Callahan] . . . with the intent that [Callahan] engage in forced labor or services[.]" The Texas Penal Code specifically defines "forced labor or services" as "labor or services, *other than labor or services that constitute sexual conduct*, that are performed or provided by another person and obtained through an actor's use of force, fraud, or coercion." Tex. Penal Code Ann. § 20A.01(2) (emphasis added). This serves as a strong indication of legislative intent to differentiate offenses under Section 20A.02(a)(1) from offenses under Sections 20A.02(a)(3)–(4). Stated differently, section 20A.02(a)(1) criminalizes *labor trafficking*, whereas Sections 20A.02(a)(3)–(4) criminalize *sex trafficking*.

The record is replete with evidence showing that appellant intentionally or knowingly trafficked Callahan and, through fraud, caused Callahan to engage in labor and services in the form of respite care, including feeding, bathing, and putting to sleep.

### 2. Counts two and three – sex trafficking

Although counts two and three both alleged sex trafficking, the wording of Texas Penal Code section 20A.02 indicates that subdivisions (a)(3)(A) and (a)(4)

7

are considered separate offenses.

Count two—based on Texas Penal Code 20A.02(a)(3)(A)—alleged that appellant "did . . . intentionally or knowingly traffic [Callahan] . . . and through force[,] fraud[,] or coercion caused [Callahan] to engage in conduct prohibited by Texas Penal Code Section 43[.]02." Section 43.02 criminalizes prostitution: "[a] person commits an offense if the person knowingly offers or agrees to receive a fee from another to engage in sexual conduct." Tex. Penal Code Ann. § 43.02. Sexual conduct includes "sexual contact," which is defined as "any touching of the anus, breast, or any part of the genitals of another person with intent to arouse or gratify the sexual desire of any person." Tex. Penal Code Ann. § 43.01(3). Count three— based on Texas Penal Code 20A.02(a)(4)—alleged that appellant "did . . . intentionally or knowingly receive a benefit of sexual arousal and gratification from trafficking [Callahan] . . . through force[,] fraud[,] or coercion and caused [Callahan] to engage in conduct prohibited by Texas Penal Code Section 43[.]02."

When compared to one another, we see that Texas Penal Code section 20A.02(a)(3)(A) defines the offense in terms of trafficking a person and *causing* the trafficked person to perform the conduct of the offense of prostitution. Meanwhile, Texas Penal Code section 20A.02(a)(4) defines the offense in terms of *receiving a benefit* as a result of a trafficked person performing the conduct of the offense of prostitution.

In this case, count two was allegedly committed when Callahan agreed to care for appellant as instructed by appellant in exchange for a fee. Count three was allegedly committed when appellant appeared to stimulate herself while Callahan changed her diaper and wiped her genitals or, alternatively, when appellant touched Callahan's breasts.

In summary, the three subdivisions in question criminalize three distinct

results: (1) appellant trafficking Callahan with the intent that she engage in forced labor/services in the form of respite care (count one); (2) appellant trafficking Callahan, and through fraud, causing her to agree to give appellant sexual contact in exchange for a fee (count two); and (3) appellant receiving a benefit of sexual arousal and gratification from participating in a venture that involved Callahan agreeing to receive a fee to engage in sexual contact (count three). Therefore, we conclude that the three offenses as charged constituted separate offenses for double-jeopardy purposes. The trial court did not err by rendering judgment on each of the three counts.

We overrule appellant's first and second issues.

## III. EXCLUDED TESTIMONY

In her third issue, appellant argues that the trial court erred by excluding the expert testimony of her psychiatrist Harvey Rosenstock and her therapist Jennifer Chapple during the guilt-innocence phase of trial.

### A. Standard of review and applicable law

Apart from the insanity defense, upon which appellant does not rely in this case, Texas does not recognize any other diminished capacity affirmative defense to criminal responsibility. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008). "Instead, diminished capacity is a simple failure-of-proof defense in which a defendant argues that the State has failed to establish that, at the time of the offense, the defendant had the requisite state of mind." *Williams v. State*, 502 S.W.3d 262, 268 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd). Thus, "both lay and expert testimony of a mental disease or defect that directly rebuts the particular *mens rea* necessary for the charged offense is relevant and admissible unless excluded under a specific evidentiary rule." *Ruffin*, 270 S.W.3d at 588.

"A trial judge's decision to admit expert testimony is reviewed for an abuse of discretion and may not be reversed unless that ruling fell outside the zone of reasonable disagreement." *Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015). Thus, the trial court's ruling must be upheld if it was within the zone of reasonable disagreement. *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim. App. 1990 & 1991) (op. on reh'g).

The admissibility of expert testimony is governed by Texas Rule of Evidence 702. *See* Tex. R. Evid. 702. Under Rule 702, a trial court's first task is "to determine whether the testimony is sufficiently reliable and relevant to help the jury in reaching accurate results." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *see* Tex. R. Evid. 702.

## B.      Analysis

Appellant contends the trial court prevented her from presenting her defense by excluding testimony regarding the alleged mental illnesses she was suffering from at the time of the offense. More specifically, appellant argues that the testimonies from Rosenstock and Chapple were admissible to show the impaired condition of her mind at the time of the offense and tended to negate the requisite culpable mental state.

However, the proffer contained nothing indicating appellant's inability to form the intent necessary to commit the offense of trafficking of persons. Chapple and Rosenstock would have testified regarding her various mental conditions, including borderline personality disorder with extreme attachment issues, mixed bipolar disorder, attention deficit hyperactivity disorder, eating disorder, and major depressive disorder. They both would have testified that appellant's actions were not sexually motivated, but ultimately, neither of them testified that appellant was *incapable* of forming the necessary intent.

10

The proffered expert testimony neither addressed nor negated the specific *mens rea* element required to convict appellant of trafficking of persons. As such, it was not relevant and the trial court did not abuse its discretion in excluding the evidence during guilt innocence phase. *Ruffin*, 270 S.W.3d at 587–88; *see Williams*, 502 S.W.3d at 276 (concluding that trial court did not err in excluding expert testimony when proffered evidence did not specifically address defendant's "ability or inability to form the intent" required to convict defendant of murder).

Accordingly, appellant's third issue is overruled.[3]

## IV. CONCURRENT FINES

In her fourth issue, appellant argues that the judgment should be reformed to reflect that the fines run concurrently and that her total fine due is $10,000, not $25,000. We agree with appellant and modify the judgment to reflect that the fines run concurrently.

In pronouncing punishment, the trial court declared:

The State has made a motion for these to run consecutive. I will grant that motion. They will run consecutive, meaning the first count of two years will be served in its entirety before Count Two's four years begins. That four-year sentence will run in its entirety before the third count, ten years, is to run. *The fines, I will run concurrently.* You have five days on each of these counts.

(emphasis added). The judgment properly reflects that the sentences shall run consecutively. The judgment also reflects the amount of the fees assessed on each

___

[3] We also note that appellant argues the exclusion of Rosenstock's and Chapple's testimony prevented her from presenting her defense regarding how her mental health affected her motivations. And yet, in her appellate brief, appellant admits that she was still able to explain to the jury "in lay terms about her [mental health] conditions and how they affected her motivations and perceptions." In other words, appellant was still able to present to the jury her defensive theory that she did not have the requisite intent because none of her conduct or contact with Callahan was sexually motivated but was instead the result of her need for care, comfort, and companionship.

count, which were pronounced orally: $5,000, $10,000, and $10,000, respectively. But the second page of the judgment lists the general fine amount as $25,000, and the judgment does not reflect that appellant's fines run concurrently.

"[W]here multiple fines are assessed in a same-criminal-episode prosecution and they are ordered to be discharged concurrently, they discharge in the same manner as concurrent terms of confinement—the defendant pays the greatest amount of fine but receives credit for satisfying all of the multiple concurrent fines." *Anastassov v. State*, 664 S.W.3d 815, 822 (Tex. Crim. App. 2022). In *Anastassov*, the court indicated that a proper judgment in such a case would list all of the fines assessed but indicate specifically that the fines were being assessed concurrently. *See id.* at 824.

We sustain appellant's fourth issue and modify the judgment to reflect that the listed fines for the three counts will run concurrently.

## V.    REIMBURSEMENT FEES

In her fifth issue, appellant argues that we should strike the reimbursement fee of $270 from the judgment because there is no evidence to support it. However, the worksheet attached to the payment extension agreement filed in the supplemental clerk's record shows that the reimbursement fee of $270 consisted of $50 for one capias issued, $10 for service of a capias, $10 for one bond filed, and $200 for 40 subpoenas at $5 apiece. Each of these fees are mandatory court costs, which result in a "predetermined, legislatively mandated obligation imposed upon conviction." *See Johnson v. State*, 423 S.W.3d. 385, 389 (Tex. Crim. App. 2014). We overrule appellant's fifth issue.

## III.    CONCLUSION

We modify the trial court's judgment to reflect that the fines run

concurrently and affirm, as modified, the remainder of the judgment as challenged on appeal.

/s/    Charles A. Spain
        Justice

Panel consists of Justices Wise, Spain, and Hassan.

Publish—Tex. R. App. P. 47.2(b).